UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| KARIN LEUTHY and KELLI WHITLOCK BURTON | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:17-cv-00296-JAW |
| | ) | |
| PAUL R. LePAGE, in his individual and official capacity as Governor of Maine, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION TO DISMISS

Two Maine residents bring this action pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief against the Governor of Maine, alleging that by blocking their access to a social media page they claim has been managed by him and by deleting their comments from the page based on their viewpoints, the Governor violated their rights to free speech and to petition the government for a redress of grievances guaranteed by both the United States and Maine constitutions. The Governor moves to dismiss the Plaintiffs' claims on the grounds that his management of the social media page does not constitute action under color of state law and that his free speech rights protect his ability to delete comments and ban people from his page. In the alternative, the Governor argues that, even if the management of his Facebook page constitutes state action, the claims must still be dismissed because his actions constitute government speech, which cannot give rise to a First Amendment

violation. He also argues that channels to petition the government remain open to the Plaintiffs.

The Court denies the Governor's motion because it is premature. The parties to this case do not agree on a basic fact: what exactly is the social media page in question. Is it, as Plaintiffs allege, the Governor's official page that he uses to discuss policy issues? Is it, as the Governor claims, a holdover campaign page that the Governor uses to communicate with his base and his base with him? Is it somewhere in between? On a motion to dismiss a complaint, the Court must assume the truth of all well-pleaded facts and inferences, and therefore, the Court must assume that the social media page is the Governor's official social media page. In doing so, the Court is not able to squarely reach the merits of the issues in the Governor's motion to dismiss.

## I.    BACKGROUND

### A.    Procedural History

On August 8, 2017, Karin Leuthy and Kelli Whitlock Burton filed a complaint against Paul R. LePage, in his individual capacity and official capacity as Governor of the state of Maine, alleging that his censorship of his official "Paul LePage, Maine's Governor" page on the social media platform Facebook violates rights guaranteed to them by both the United States and Maine constitutions. *Compl.* (ECF No. 1). The Complaint contains five counts: (1) Count I alleges that Governor LePage's banning of the Plaintiffs from his Facebook page violates their First Amendment free speech rights by imposing a viewpoint-based restriction on their participation in a limited

public forum; (2) Count II alleges that the Governor's action violates the First Amendment because it imposes a viewpoint-based restriction on the Plaintiffs' right to petition the government for redress of grievances; (3) Count III alleges that the Governor's action violates the free speech rights guaranteed to the Plaintiffs by Article I, Section 4 of the Maine Constitution; (4) Count IV alleges that, by imposing a viewpoint-based restriction on the Plaintiffs' participation in a limited public forum, the Governor's action violates the Plaintiffs' right to petition the government embodied in Article I, Section 15 of the Maine Constitution; and (5) in Count V, the Plaintiffs seek a declaratory judgment. *Id.* at 17-19.

On October 13, 2017, the Governor filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6). *Def.'s Mot. to Dismiss* (ECF No. 9) (*Def.'s Mot.*). The Plaintiffs responded on November 3, 2017. *Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss* (ECF No. 11) (*Pls.' Opp'n*). The Governor replied to the Plaintiffs' response on November 17, 2017. *Def.'s Reply in Supp. of Mot. to Dismiss* (ECF No. 12) (*Def.'s Reply*).

On April 20, 2018, the Governor filed a supplementary memorandum, *Def.'s Suppl. Mem. in Supp. of Mot. to Dismiss* (ECF No. 13) (*Def.'s Suppl. Mem.*), in which he indicated that he "is amenable to oral argument in this matter and available to schedule argument at the Court's convenience." *Def.'s Suppl. Mem.* at 1 n.1. The Plaintiffs responded to the supplementary memorandum on April 24, 2018. *Pls.' Resp. to Suppl. Mem.* (ECF No. 14) (*Pls.' Suppl. Resp.*). On May 23, 2018, the Plaintiffs filed their own supplementary memorandum, *Pls.' Notice of Suppl.*

*Authority* (ECF No. 15) (*Pls.' Suppl. Mem.*), and the Governor responded on June 1, 2018. *Def.'s Resp. to Notice of Suppl. Authority* (ECF No. 16) (*Def.'s Suppl. Resp.*).[1]

## B. The Alleged Facts[2]

### 1. The Parties

Karin Leuthy is a resident of Camden, Knox County, Maine. *Compl.* ¶ 10. Ms. Leuthy is a freelance writer and editor. *Id.* ¶ 49. She is a cofounder of Suit Up Maine, a state-wide progressive grassroots network started in November 2016. *Id.* The group has more than 5,000 members who work to raise awareness of and advocate for policies, legislation, and initiatives related to civil rights, social justice, healthcare, the environment, education, and other areas that affect the lives of all Mainers. *Id.* Kelli Whitlock Burton is a resident of Waldoboro, Lincoln County, Maine. *Id.* ¶ 11. Ms. Whitlock Burton is a science and medical freelance writer. *Id.* ¶ 56. She is a cofounder of Suit Up Maine. *Id.* Paul R. LePage is the Governor of the state of Maine. *Id.* ¶ 12. He is a resident of Augusta, Kennebec County, Maine, with an official office in Augusta, Kennebec County, Maine. *Id.*

### 2. Facebook and Public Officials

Social media have recently become a crucial venue for public officials to disseminate news and information, and an equally crucial opportunity for the public

---

[1] Plaintiffs contend that a recent case, *Knight First Amendment Inst. at Columbia Univ. v. Donald J. Trump,* 302 F. Supp.3d 541 (S.D.N.Y. May 23, 2018), is analogous and supports their position that dismissal is unwarranted. As will be discussed, the Court has not relied on *Knight.*

[2] In considering a motion to dismiss, a court "accept[s] all well-pleaded facts in the complaint as true." *Gilk v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 36 (1st Cir. 2009)). A court also "construe[s] all reasonable inferences in favor of the plaintiff." *Sanchez*, 590 F.3d at 41.

to express their thoughts and opinions in response. *Id.* ¶ 2. Facebook, Twitter, and other social media platforms provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. *Id.* These platforms are revolutionary in their ability to increase civic engagement with elected officials through instantaneous and direct communication opportunities. *Id.* The ability of social media platforms such as Facebook to serve as forums for direct communication between constituents and public officials is analogous to speech that, until recently, was only attainable for people physically gathered in the same space, such as in a public park or town hall. *Id.* As such, cyberspace has become one of the most important places for the exchange of views, one which enables a person to become a town crier with a voice that resonates farther than from any soapbox. *Id.*

Facebook is a social media platform with approximately 1.94 billion monthly users worldwide, including approximately 234 million users in the United States and Canada. *Id.* ¶ 20. The website allows users to post messages and photos, to respond to or share others' messages or photos, and to interact with other Facebook users in relation to those posts. *Id.* A "status update" is a post shared with a Facebook user's friends or the public, depending on the user's privacy settings. *Id.* ¶ 21. These posts can range from written messages to photos and videos. *Id.*

Facebook users can subscribe to other users' posts by "following" a user's page. *Id.* ¶ 22. Users see all messages posted by or shared by the users or pages they have followed. *Id.* Facebook users can post replies to other users' posts or to comments on their own posts. *Id.* ¶ 23. Replies appear on the post among other users' replies. *Id.*

Facebook users can "share" another user's post, which publishes the other user's post on the user's own timeline, among their own posts. *Id.* ¶ 24. Facebook users also are able to react to posts using graphics without replying or posting their own comments. *Id.* ¶ 25.

Users are able to "ban" other users from their page. *Id.* ¶ 26. When a user is banned from a page, they lose their ability to publish, react to posts, or comment on the posts on that page. *Id.* In its Help Center, Facebook explains the process for and consequences of banning. *Id.* ¶ 27 (citing *Help Center, How do I Ban or unban someone from my Page?*, FACEBOOK, https://www. facebook.com/help/185897171460 026/?ref=u2u). When people have been banned from a page on Facebook, they cannot comment or react to posts but can only see other users' comments and reactions. *Id.* ¶ 28.

In early 2017, Facebook released a new feature called "Town Hall" as a tool to help users find and contact their government representatives and to increase users' "civic engagement" with public officials on the social media platform. *Id.* ¶ 29 (quoting *Help Center, What is Town Hall?*, FACEBOOK, https://www.facebook.com/ help/278545442575921?helpref=search&sr=1&query=townhall (*Facebook Town Hall Help Page*). To participate in "Town Hall," Facebook has requirements for the elected official's Facebook page. *Id.* ¶ 30 (citing *Facebook Town Hall Help Page*). One requirement for "Town Hall" is that the elected official's page must be categorized as "Politician" or "Government Official," the official's page must use the "Politician template," and the description in the "Current Office" section of the page must

accurately reflect the official's current government position. *Id.* ¶ 31 (citing *Facebook Town Hall Help Page*).

The "Town Hall" feature allows Facebook users to connect to verified state and federal government officials. *Id.* ¶ 32 (citing *Facebook Town Hall Help Page*). When users' "Town Hall" feature is turned on, a "constituent badge" is posted along with their name when they comment on a verified representative's Facebook page. *Id.* ¶ 33 (citing *Facebook Town Hall Help Page*). A blue badge on a user's Facebook page means that the page has been "verified," or confirmed as a public figure's authentic page. *Id.* ¶ 34. Through the "Town Hall" feature, Facebook users are able to "opt-in to a tag" which publicly identifies them, through the use of this "constituent badge," as living in the district of an elected official when they are interacting on the elected official's government page. *Id.* ¶ 35 (citing Kerry Flynn, *Facebook is helping politicians better understand who they serve*, MASHABLE (Jun. 17, 2017), http://mashable.com/2017/06/07/facebook-constituent-badges-town hall/#R0TG9CExDkqX). Whenever commenting, liking, or sharing a post by a Town Hall-identified official, the user is given the option to turn on this feature. *Id.*

### 3. Governor LePage's Official Facebook Page: "Paul LePage, Maine's Governor"

Governor LePage owns and operates an official Facebook page entitled "Paul LePage, Maine's Governor." *Id.* ¶ 36. As Governor LePage's official page, "Paul LePage, Maine's Governor" is used by the Governor and his staff to share information such as news, press releases, announcements, and action items to everyone with access to Facebook, including his followers, supporters, critics, and constituents. *Id.*

¶ 37. The Facebook page is a significant source of information and news for the people of Maine, as well as a popular forum for speech by, to, and about the Governor. *Id.* ¶ 3. The page is accessible to the public, including those without a Facebook account; in regard to interactions on the page, it is accessible for all Facebook users, regardless of whether the user "likes" or "follows" the page. *Id.* ¶ 5.

"Paul LePage, Maine's Governor" is not Governor LePage's personal page. *Id.* ¶ 38. Governor LePage's personal page is simply entitled "Paul LePage." *Id.* In the "About" section of "Paul LePage, Maine's Governor," the page is described as "Paul LePage's official page – but not managed by gov't officials." *Id.* ¶ 39. The Governor's Facebook page is dynamic, with his posts reaching anywhere from tens to thousands of comments, likes, and shares. *Id.* ¶ 6. The Governor's office labeled this page as his "official page." *Id.* The page is linked to the Governor's blog on his government site, it is deemed his "official" page in the "About" section of his page, and when asked, his office has classified it as his official Facebook page. *Id.* The Governor uses the page to share press releases exclusive to the page, promote his policies, and to encourage his supporters to take action. *Id.*

"Paul LePage, Maine's Governor" is "verified" on Facebook as a public figure's authentic page and currently has 39,773 users who "like" his page. *Id.* ¶ 40. Governor LePage uses "Paul LePage, Maine's Governor" to perform government business, including relaying video messages directly to his constituents. *Id.* ¶ 41. As of July 24, 2017, "Paul LePage, Maine's Governor" was linked to Governor LePage's "Blog" on the official state of Maine Office of Governor Paul R. LePage website, as a

means of staying connected with the Governor; clicking the Facebook button on this site took users to "Paul LePage, Maine's Governor." *Id.* ¶ 42. After Plaintiffs sent a letter to Governor LePage about being banned and censored, this link was disabled. *Id.* ¶ 43.

"Paul LePage, Maine's Governor" is recognized as a "Politician" or "Government Official" page on Facebook's "Town Hall" feature. *Id.* ¶ 44. "Paul LePage, Maine's Governor" also features many first-person posts from Paul LePage, indicating that Governor LePage controls the page. *Id.* ¶ 45. Governor LePage stated in a radio interview on July 6, 2017, that he uses the Facebook Live video streaming feature on his Facebook page to bypass the news media and communicate directly with the public. *Id.* ¶ 46 (citing interview with Governor Paul LePage (Newsradio WGAN broadcast Jul. 6, 2017, https://soundcloud.com/ newsradio-wgan/7617)). "Paul LePage, Maine's Governor" is interactive. *Id.* ¶ 47. It is both a platform for constituents to voice their gratitude or concerns and for Governor LePage to engage with constituents. *Id.*

Maine's Office of Information Technology has established a policy regarding the use of social media for state business, which anticipates comments and contributions from constituents critical of governmental officials and their policies.[3] *Id.* ¶ 48. The Governor's office approved and enforces this policy. *Id.* Regarding negative commentary, the policy states: "Any scandalous, libelous, defamatory, or

---

[3]     The Plaintiffs state, "[a]s an official Maine governmental page, 'Paul LePage, Maine's Governor' is bound by a policy established by Maine's Office of Information Technology on the use of social media for state business . . . ." *Compl.* ¶ 48. The Court excludes this statement as a legal conclusion.

pornographic material, if posted, is removed as soon as discovered." *Id.* The policy further states that "[a]gencies must create and publish a Terms of Comment which describes how the Agency will manage user contributions to the extent allowed by the Social Media site/application. The Terms of Comment shall detail the review criteria for acceptable comments, such as on-topic, non-duplicative, not obscene or offensive etc." *Id.* (citing *Social Media for State Business Policy*, MAINE OFFICE OF INFORMATION TECHNOLOGY, available at https://www1.maine.gov/oit/policies/Social MediaStateBusiness.pdf).

### 4. Plaintiffs' Interaction with "Paul LePage, Maine's Governor"

#### a. Karin Leuthy

Ms. Leuthy began interacting with Governor LePage by following and commenting on his Facebook page during the 2014 gubernatorial election. *Id.* ¶ 50. She increased her interaction with Governor LePage during the weeks leading up to the state government shutdown in July 2017. *Id.* ¶ 51. On July 6, 2017, Ms. Leuthy made two statements to Governor LePage through "Paul LePage, Maine's Governor." *Id.* ¶ 52. One comment quoted the Governor about intentionally misleading the press; and the second questioned why the Governor was not responding to reporters, accompanied by a link to a Bangor Daily News article. *Id.* Approximately one hour after Ms. Leuthy's second comment, a supporter of Governor LePage responded to the comment. *Id.* ¶ 53. Ms. Leuthy prepared a response to this response, but before she could post it, she was banned from the site. *Id.* Neither of Ms. Leuthy's comments

was scandalous, pornographic, off topic, duplicative, or offensive.[4]  *Id.* ¶ 54. Defendant's banning of Ms. Leuthy from the "Paul LePage, Maine's Governor" Facebook page prevents or impedes her from commenting on the Governor's posts, sharing his posts, and engaging in discussion with Governor LePage and with other constituents. *Id.* ¶¶ 7, 55.

### b.   Kelli Whitlock Burton

Ms. Whitlock Burton first commented on "Paul LePage, Maine's Governor" on July 6, 2017.  *Id.* ¶ 56.  Ms. Whitlock Burton posted two comments on "Paul LePage, Maine's Governor" on July 6, 2017 and took screenshots of both comments in anticipation of their possible deletion.  *Id.* ¶ 57.  Ms. Whitlock Burton's first comment on "Paul LePage, Maine's Governor" was a response to Governor LePage's July 4, 2017 "Happy Independence Day!" post.  *Id.* ¶ 58.  Ms. Whitlock Burton's post criticized the Governor's practice of deleting constituents' comments:

> Governor LePage, I am hearing from a number of your constituents that they have been blocked from your Facebook page and their comments deleted.  I have seen screen shots of the comments and they are not inappropriate, profane or disrespectful.  They only disagree with your stance on certain issues and events.  Perhaps this is an oversight?  Because to remove constituents from your Facebook account simply because they disagree with you seems to be a poor reflection of the Office of the Governor.  The blocking from social media of constituents who disagree with policies or legislation is a disturbing trend among Republican elected officials.  I certainly hope that you and your office are not traveling down that road.

---

[4]    The Plaintiffs contend that neither of Ms. Leuthy's comments was libelous, obscene, or defamatory.  *Compl.* ¶ 54.  The Court excludes this portion of the statement as constituting legal conclusions; in addition, the Governor does not characterize Ms. Leuthy's comments as such.

*Id.* Later that same day, July 6, 2017, Ms. Whitlock Burton commented on another post on the Governor's page. *Id.* ¶ 59. Governor LePage's post discussed the media falsely reporting that he was taking a vacation:

> Over this past weekend, during budget negotiations, Governor LePage was attempting to get Senators to return his call during the midst of then negotiations. He wanted to make it clear when speaking with folks that he would not sign a budget which increased taxes on the Maine people and small businesses.
>
> When media contacted the Governor's office regarding a vacation the office was 100% accurate and clear that the Governor was not taking a vacation.

*Id.* On this post, Ms. Whitlock Burton posted a comment stating: "Gov. LePage, it was members of your own party who told reporters that you had said you were taking a vacation. Perhaps you should direct your anger and frustration at those who talked to the media, not at the media for reporting it." *Id.* ¶ 60.

Ms. Whitlock Burton realized within hours of posting the two comments on July 6, 2017, that her comments had been deleted, and that she had been banned from further posting, liking, or replying to any content on the Governor's page. *Id.* ¶ 61. Neither of Ms. Whitlock Burton's comments was scandalous, pornographic, off-topic, duplicative, or offensive.[5] *Id.* ¶ 62. The Governor's banning of Ms. Whitlock Burton from the "Paul LePage, Maine's Governor" Facebook page prevents or impedes her from commenting on the Governor's posts, sharing his posts, and engaging in discussion with other constituents. *Id.* ¶¶ 7, 63.

---

[5] The Plaintiffs assert that neither of Ms. Whitlock Burton's comments was libelous, obscene, or defamatory. *Compl.* ¶ 62. The Court excludes this portion of the statement as constituting legal conclusions; in addition, as with Ms. Leuthy, the Governor does not contend that Ms. Whitlock Burton's comments were libelous, obscene, or defamatory.

## II.     LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "Plausible . . . means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' [the judge's] 'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"

*Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## III.   DISCUSSION

### A.   Action Under Color of State Law

"To state a claim for relief in an action brought under [42 U.S.C.] § 1983," plaintiffs must establish that (1) "they were deprived of a right secured by the Constitution or laws of the United States," and (2) "the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "Section 1983's 'under color of state law' requirement is the functional equivalent of the Fourteenth Amendment's 'state action' requirement. Accordingly, [courts] regard case law dealing with either of these formulations as authoritative with respect to the other, and . . . use the terminologies interchangeably." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (citing, *e.g.*, *United States v. Price*, 383 U.S. 787, 794 n. 7 (1966)).

#### 1.   The Governor's Position

The Governor maintains that the actions alleged in the Plaintiffs' Complaint do not constitute action under color of state law and therefore, both First Amendment claims must fail. *Def.'s Mot.* at 1-2. He states that his Facebook page "has been consistently employed as a platform of expression for [him] as a politician in his

private capacity . . . ," *id.* at 7, and that it is not administered by the government. *Id.* at 1. He states that the page was created nearly a year before he became governor and has always identified its purpose as advancing his messages and those of his supporters. *Id.* He likens the page to supportive campaign literature or a political rally, emphasizing his status as a politician and former candidate for office over his role as Governor. *Def.'s Reply* at 4. He states that "[i]t is of no moment that the page no longer clearly states a specific office or term for which [he] is currently seeking elective office." *Id.* He claims that the page is operated under his name and "not the Office of the Governor." *Def.'s Mot.* at 1. He also maintains that the page discloses that no government officials administer the site and that the page redirects constituents with official inquiries to other channels. *Id.* at 1-2.

Furthermore, the Governor contends that the page is "distinct in form and substance from official state agency Facebook pages." *Id.* at 2. He avers that the administration of the Facebook page "is not among any actual or apparent duties of the Office of the Governor of Maine, nor does state law require or otherwise provide for the administration of a governor Facebook account." *Id.* at 13; *see Def.'s Reply* at 2. He also claims that the page "does not meet any of the requirements of an official social-media account set forth in Social Media for State Business Policy." *Def.'s Reply* at 2. The Governor suggests that for these reasons the Complaint "cannot support an inference that the administration of the page is an act LePage performs 'under color of law' pursuant to 'an actual or apparent duty of his office.'" *Def.'s Mot.* at 2 (quoting *Davignon v. Hodgson*, 524 F.3d 91, 112 (1st Cir. 2008) (quotation omitted)).

The Governor maintains that his posts regarding official business to the Facebook page do not change this conclusion. *Id.* at 13 (citing Eugene Volokh, *Is @RealDonaldTrump Violating the First Amendment by Blocking Some Twitter Users?*, THE VOLOKH CONSPIRACY (WASH. POST Jun. 6, 2017), http://goo.gl/G8Qfus). He maintains that "[t]o conflate politicians' statements promoting their political agenda with the official duties of public office produces irrational results" such as one's discussion of political accomplishments at a cocktail party being deemed action under color of state law. *Id.* at 14. The Governor observes that much of what elected officials do and say is in some way related to their public office, and he suggests the need for a limiting principle to guide courts in determining "which portions of politicians' lives are and are not fair game for § 1983 suits." *Def.'s Reply* at 3.

## 2. The Plaintiffs' Position

The Plaintiffs state that challenged conduct is under color of state law when it is "related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Pls.' Opp'n* at 10 (quoting *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997) (citing *Martinez v. Colon*, 54 F.3d 980, 987 (1st Cir. 1995))). They argue that the Governor's Facebook page meets this standard. *Id.*

The Plaintiffs highlight that the page (1) uses the label "official", (2) invokes the Governor's title: "Paul LePage, Maine's Governor," (3) operates under the verified banner of "Maine's Governor," (4) participates in Facebook's 'Town Hall' feature for government representatives, (5) links to the official Maine.gov website, (6) includes

his official email address, physical address, and phone number on his Facebook page, and (7) engages citizen responses on matters of public concern. *Id.* at 1, 11-12. The Plaintiffs analogize this set of factors to those another court considered and relied upon in finding a public official's Facebook page operated under color of state law. *Id.* at 11 (citing *Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702 (E.D. Va. July 25, 2017)).[6] The Plaintiffs disagree with the Governor's contention about the import of the fact that the page was established before his election, by stating that even if such timing is correct, the Governor signaled the official nature of the post-election page by changing its title to "Maine's Governor." *Id.* at 12. The Plaintiffs also maintain that the fact that the page is categorized as a "Public Figure" rather than "Government Official" likely stems from its creation before his election and is ultimately not determinative. *Id.* They reiterate the fact-intensive nature of the inquiry and posit that the most persuasive factors here are the "Maine's Governor" label and his participating in Facebook's Town Hall feature for government representatives. *Id.*

The Plaintiffs aver that one element of discharging the Governor's official duties is using publicity to advance the gubernatorial agenda, including communication and interaction with the constituents of Maine. *Id.* at 13. They cite

---

[6]     In *Davison*, 267 F. Supp. 3d 702, following a bench trial, the Eastern District of Virginia entered judgment in favor of an individual who brought a First Amendment free speech claim against a county official who banned him from her Facebook page for a period of twelve hours. The defendant, Phyllis J. Randall, was Chair of the Loudoun County Board of Supervisors, and the relevant Facebook page was entitled "Chair Phyllis J. Randall." *Id.* at 706. The Court found that she "acted under color of state law here, both in maintaining her 'Chair Phyllis J. Randall' Facebook page generally, and in taking the specific action of banning Plaintiff from that page." *Id.* at 711-12. As the resolution of the Governor's motion to dismiss turns on its procedural posture, the Court does not find *Davison* helpful because the *Davison* Court resolved contested factual issues at the bench trial.

the Legislature's creation of the "Governor's Office of Communications," as evidence of this. *Id.* (citing 2 M.R.S. § 10). The Plaintiffs state that the Governor uses the Facebook page for precisely this purpose, citing his communications about topics such as budget negotiations with the Legislature. *Id.*

### 3. Analysis

Courts "examine[] the totality of the circumstances, to determine whether the 'state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or . . . is such that the actor could not have behaved in that way but for the authority of his office.'" *Davignon*, 524 at 112 (quoting *Martinez*, 54 F.3d at 986). "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Martinez*, 54 F.3d at 986. Whether the official is acting "under pretense of law" is "[o]ne relevant facet of this inquiry." *Parilla-Burgos*, 108 F.3d at 448-49.

Plaintiffs pleaded facts alleging that the Governor's operation of his Facebook page relates to "an actual or apparent duty of his office," *Davignon*, 524 F.3d at 112 (citing *Martinez*, 54 F.3d at 986), or is "related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Parrilla-Burgos*, 108 F.3d at 449. The Governor's page is designated his "official page," invokes his official title, and is separate from his personal page. *C.f. German v. Eudaly*, No. 3:17–cv–2028–MO, 2018 WL 3212020, at *6 (D. Or. Jun. 29, 2018) (city commissioner's posting to her undisputed personal, non-official Facebook page, when she also maintained an official Facebook page, did not constitute state action). "Paul LePage,

Maine's Governor" is recognized as a politician or government official on Facebook's Town Hall feature, which is designed to help users contact their verified government representatives and enhance civic engagement. These facts lend "Paul LePage, Maine's Governor" an imprimatur of governmental connection and authority.

By contrast, the Governor characterizes the page very differently as campaign-oriented and political in nature. The Court is sensitive to the Governor's valid point that, because much of what he and other elected officials do and say relates in some way to their official duties, in the absence of a limiting principle, little of their activity would be incapable of giving rise to § 1983 suits. Specifically, the Governor maintains that the Facebook page was created nearly a year before he assumed the Office of Governor, that it is expressly labeled a "Public Figure" page, not a "Government Official" page, that the page states it is "fan created" and is "not managed by gov't officials", and that if the user is looking for the Governor's official website, the page redirects the user to his Maine.gov website. At this point in the lawsuit, however, the Court need not demarcate the line between private and public speech because the Court is required to accept the Plaintiffs' allegations as true. The Court may not accept the Governor's alternative version of the facts.

Whether conduct constitutes state action is often fact-intensive, and requires "sifting facts and weighing circumstances." *Santiago*, 655 F.3d at 68 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)). The Plaintiffs pleaded facts that lead to a reasonable inference the Governor acted under color of state law when he deleted their posts and banned them from his Facebook page. Accepting the

Plaintiffs' allegations as true solely for purposes of the Governor's motion to dismiss, the Court rejects his argument for dismissal bottomed on contrary facts.

**B.    Defining the Speech and Speakers at Issue**

**1.    The Governor's Position**

The Governor contends that, even if the Complaint plausibly alleges that his operation of the Facebook page constitutes action under state law, "dismissal is required because the page (and the moderation of comments thereon) would constitute government speech." *Def.'s Mot.* at 2, 15. His premise is that forum analysis is inapplicable to government speech. *Id.* (quoting *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny.")). He observes that "[t]he government may constitutionally 'say what it wishes, and to select the views that it wants to express.'" *Id.* at 2 (quoting *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 329-30 (1st Cir. 2009) (quotations and citation omitted)). He quotes caselaw for the proposition that "[a]s a constitutional matter, the right to speak extends to the right not to be forced to adopt someone else's speech." *Id.* at 16 (quoting *Newton v. LePage*, 849 F. Supp. 2d 82, 118 (D. Me. 2012), *aff'd*, 700 F.3d 595 (1st Cir. 2012) (citing *Wooley v. Maynard*, 430 U.S. 705, 714 (1977))).

The Governor asserts that he has the discretion to select what speech by others he wants presented on his Facebook page. *Id.* at 16, 18. He characterizes his exercise of this discretion as "[i]ncorporating private speech through third-party comments into his own speech . . . [so as to] accomplish[ ] his broader effort to express a message

that promotes certain policies on the Facebook page." *Id.* at 17. He also claims a "First Amendment right to disavow messages [he] do[es] not wish to be associated with." *Def.'s Reply* at 6.

The Governor analogizes this case to *Sutliffe*, a case involving government speech and the Internet. *Def.'s Mot.* at 17-18. He says that his Facebook page is similar to the *Sutliffe* town website, which the First Circuit deemed government speech—and not a public forum—over which the town retained control and discretion, including the ability to include or exclude hyperlinks to external websites. *Def.'s Mot.* at 18 (citing *Sutliffe*, 584 F.3d at 333-34). The Governor expresses concern that "[a]pplying forum doctrine to cases such as these risks flooding government websites with outside messages that 'mak[e] it impossible for the [government] to effectively convey its own message [thus] defeating the very purpose of the website.'" *Id.* at 18 (quoting *Sutliffe*, 584 F.3d at 334).

The Governor cites *Sutliffe* and other caselaw where courts have held that a state's speech does not lose its governmental nature simply because it derives its content from private sources. *Def.'s Reply* at 5 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009); *Newton*, 700 F.3d 595; *Sutliffe*, 584 F.3d at 330). He argues that those cases involved "speech contributions that traditionally remain closely affiliated with their creator" and that "nevertheless, such affiliation or attribution alone does not transform government speech into an open forum for private speech." *Id.* at 5-6.

The Governor argues that the First Amendment rights at stake in this case are his, not the Plaintiffs'. *Def.'s Mot.* at 1. He asserts that "Paul LePage, Maine's Governor" is private speech and that the First Amendment protects his ability to control the content posted on his page. *Id.* at 7. He claims that these rights "include[e] the right to control the messages [he] promote[s]." *Id.* at 1. The Governor argues that the Plaintiffs seek to unconstitutionally restrict his "ability to choose which messages to promote and instead require[e] him to open up that page to all comers, no matter how vociferously their comments may conflict with and detract from [hi]s own messages and priorities." *Id.* He asserts that if the Plaintiffs are successful, he will be forced to "either to broadcast a cacophony of messages with which they disagree, or to change their pages into static sites stripped of the networking features that define social media." *Id.*

The Governor also cites *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), for the proposition that freedom of expression includes the right "to exclude a message [one does] not like from the communication [one chooses] to make." *Def.'s Mot.* at 8 (quoting *Hurley*, 515 U.S. at 574). He argues that his right to post political viewpoints and policy positions on his Facebook page "is therefore inseparable from his right to delete third-party comments from that same page in order to tailor the message he communicates." *Id.*

The Governor observes that elected officials do not lose their rights to free speech when they assume office. *Id.* at 1. He characterizes the Plaintiffs as asserting that the First Amendment protects their political commentary on Facebook to a

greater extent than it protects his use of his Facebook page to espouse his own political viewpoints, and he cites *Bond v. Floyd*, 385 U.S. 116, 136 (1966) as rejecting such a distinction. *Def.'s Mot.* at 9. He analogizes the situation here to those cases involving political rallies hosted by incumbent public officials. *Id.* at 9-10 (citing *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996); *Weise v. Casper*, No. 05–cv–02355–WYD–CBS, 2008 WL 4838682, at *8 (D. Colo. 2008) *aff'd on other grounds*, 593 F.3d 1163, 1168-69 (10th Cir. 2010); *Schwitzgebel v. City of Strongsville*, 898 F. Supp. 1208, 1219 (N.D. Ohio 1995)).

## 2. The Plaintiffs' Position

The Plaintiffs maintain that by opening an online platform for public comment, the Governor created a designated public forum and that, "in any event, viewpoint restriction (as practiced by the Governor) is impermissible even in a non-public forum." *Pls.' Opp'n* at 2. They cite *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995): "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id.* at 8 (citing *Rosenberger*, 515 U.S. at 828 (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972))).

The Plaintiffs point out that the Governor admits he deleted their posts and excluded them from his Facebook page because he disagrees with their viewpoints. *Id.* at 1, 7. They argue that his deletion of Ms. Whitlock Burton's post criticizing his deletion of the posts of others "doubly violated core First Amendment principles" by "removing evidence of his censorship" in addition to distorting the marketplace of

ideas.  *Id.* at 1, 9.  They argue that by this action, the Governor projected a false appearance of open public debate.  *Id.* at 1, 9.  They observe that this alleged viewpoint discrimination took place in core political speech, which is of special importance in First Amendment doctrine.  *Id.* at 9.  The Plaintiffs underscore that the context—social media—is one the Supreme Court recently characterized as "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Compl.* ¶ 2 (quoting *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017)); *Pls.' Opp'n* at 2, 9 (citing *Packingham*, 137 S. Ct. at 1735-37).

The Plaintiffs' reject the Governor's framing of this case as about his own expression of opinion.  *Pls.' Opp'n* at 1-2.  They underscore that they complain not of the Governor's words, but of his censorship of comments by others.  *Id.* at 1-2.  So, while the Governor's own posts may be government speech, the Plaintiffs state, the conduct at issue is censoring private speech, not affirmative government speech.  *Id.* at 16-17.  They observe that the posts on the Facebook page are clearly labeled with the name of the person who posted them.  *Id.* at 17.  For this reason, the Plaintiffs argue, the Governor's speech—in the form of his posts—is clearly marked as distinct from the posts private citizens make on his page.  *Id.* at 17-18.  Thus, a reader of the page would interpret the various posts by various speakers on the Governor's page "as a conversation between different speakers, not as monolithic government speech."  *Id.* at 18.  For these reasons, the Plaintiffs dispute the Governor's assertion that an inability to delete posts would force him to adopt the speech of those who comment on his page.  *Id.* at 20.

The Plaintiffs analogize themselves to disfavored voices at a town hall or school board meeting and suggest that the Court should not condone the Governor's actions with respect to them any more than it would censorship of speech at those analogous in-person proceedings. *Id.* at 20-21 (citations omitted),

### 3. Deleting Posts as Speech

The Governor is correct that the government's own speech is immune from First Amendment scrutiny, *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017); however, he fails to persuade the Court on this motion to dismiss that his speech is at issue in this case. Based solely on the allegations in the Complaint, the Court must disagree with the premise that all of the information on the Governor's Facebook page constitutes his speech. The posts on the Facebook page are labeled with the name of the person who posted them, and the Governor's speech—his posts—is distinct from the private citizen posts.

For purposes of this motion, the Court is similarly unpersuaded that the Governor incorporates or adopts the comments and posts of others as his own speech simply by not deleting them after the speakers post them to his page. Such posts are readily distinguishable from a city's acceptance of a donated monument for display in a public park or a town's inclusion of private-company hyperlinks on the official town website—both of which have been held to be government speech. *Pleasant Grove City*, 555 U.S. at 468; *Sutliffe*, 584 F.3d at 330. Citizens posting to the "Paul LePage, Maine's Governor" page control the content and timing of their post without any prior review from the Governor. The page acts a passive conduit for the posts.

The Plaintiffs seek to participate in the interactive portion of the page, not to control the static portions over which only the Governor has control nor to generate posts on his behalf.  Their past posts were in their names, making clear that the views were theirs—not the Governor's.  *C.f., Newton*, 700 F.3d at 602 ("[A] mural's prominence, filling two walls of a small waiting room [in the Maine Department of Labor building (MDOL)], alone would easily lead viewers to understand that the government's location of the art there was an endorsement of the mural's message, even if the expression originated with the artist.  That is particularly so, given the plaque identifying the work as being commissioned by the MDOL and paid for by the state.").  Indeed a reasonable person would not expect or reasonably interpret comments critical of an elected official to be the speech of that elected official.  Such comments are not akin to government-controlled messages that merely "solicit[] assistance from nongovernmental sources."  *Sutliffe*, 584 F.3d at 330 (quoting *Pleasant Grove City*, 555 U.S. at 468).

*Sutliffe* is factually distinguishable.  There, the webpage at issue had a finite number of hyperlinks to external websites.  *Id.* at 334.  Here, as alleged by the Plaintiffs, the Facebook page is a forum capable of hosting an unlimited number of posts, designed to host ongoing discussion and commentary.  The Plaintiffs allege it is more akin to a conversation than a static repository of information.  Therefore *Sutliffe*'s concern about "flooding the Town website with private links, thus making it impossible for the Town to effectively convey its own message and defeating the

very purpose of the website and the hyperlinks chosen by the Town" does not appear to apply here. *Id.* As the *Sutliffe* Court noted,

> Our decision rests on the facts of this case. It is possible there may be cases in which a government entity might open its website to private speech in such a way that its decisions on which links to allow on its website would be more aptly analyzed as government regulation of private speech.

*Id.* at 334-35. Based on the Plaintiffs' allegations, this case plausibly falls into the category the First Circuit described. But, as the First Circuit observed in *Sutliffe*, the ruling "rests on the facts of this case" and in the context of the motion to dismiss, "the facts" are only those the Plaintiffs allege. *Id.* at 334.

With regard to their First Amendment free speech rights, again based on the Plaintiffs' allegations, the Facebook users who post messages expressing disagreement with the Governor via the "Paul LePage, Maine's Governor" page are akin to citizens who might attend a public meeting hosted by him or who organize rallies at Blaine House in that they seek to engage the Governor on issues pertinent to his official duties and to express their viewpoints in a forum and context associated with him and those duties.

The cases the Governor cites involving political rallies by incumbent elected officials are distinguishable. In those cases, the prospect of interruption and interference is real. A protester yelling and attempting to drown out the speaking elected official can easily interfere with and even halt the elected official's speech. *See Johanns*, 544 U.S. at 574 (Souter, J., dissenting) ("To govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising

the government's voice in the 'marketplace of ideas' would be out of the question."). In contrast, a Facebook post, which is textual and visible alongside posts by the Governor, his supporters, and others, does not prohibit the Governor from posting whatever and whenever he wants. His words are conveyed and received with the precision and clarity he intends.

Based on the allegations in the Complaint, which the Court must accept, the Plaintiffs stated sufficient facts to plausibly allege that the conduct in this case is the Governor's deletion of posts and banning of citizens from the "Paul LePage, Maine's Governor" page, and that this conduct does not constitute government speech. So, while "[t]he Free Speech Clause does not require the government to maintain viewpoint neutrality" when engaging in such government speech," *Matal*, 137 S. Ct. at 1757, this axiom does not appear to apply to the Plaintiffs' claims.

### 4. Banning Participants as Speech

Given that the Court is unpersuaded that deletion of the posts constitutes government speech, at least as the Plaintiffs' Complaint frames the factual issues, it follows that banning participants from the page altogether would not be government speech. Because for purposes of the motion to dismiss, the Court sees the relevant speakers as the Plaintiffs—not the Governor—and because, even when considering the Governor's free speech rights, the Court does not consider deletion of the Plaintiffs' posts nor banning them as a form of speech, the Court declines the Governor's suggestion to dismiss the case on this basis.

### C. First Amendment: Forum Analysis and Right to Exclude

### 1.    The Governor's Position

While the Governor's primary contention with respect to forum analysis is that it should not apply because management of his Facebook page is government speech, he disputes the Plaintiffs' notion that, even under forum analysis, his actions were unconstitutional.   Citing *Lloyd Corp. v. Tanner*, 407 U.S. 551, 570 (1972) and *Santasucci v. Gallen*, 607 F.2d 527, 529 (1st Cir. 1979), the Governor argues that individuals, even those seeking to engage in political speech or protest, have no First Amendment right to disseminate their messages on another's private property, even property generally open for public access.   *Def.'s Mot.* at 11.   Because Facebook is a private entity, the Governor concludes that the Plaintiffs have no right to disseminate their messages on his Facebook page.   *Id.*   He asserts that he maintains unfettered rights to exclude disfavored speech and to exclude commenters who seek to use his page beyond the scope of any implicit invitation despite allowing some third-party commentary on his Facebook page.   *Id.* at 11-12.

The Governor quotes *Student Government Association v. Board of Trustees of University of Massachusetts*, 868 F.2d 473 (1st Cir. 1989): "[w]ithout a more specific mandate from the Supreme Court, [courts should be] reluctant to extend the forum doctrine's regulatory tradition of 'absolute neutrality,' to [] instance[s] in which [the state] participates as a player in the marketplace of ideas" rather than "in its role as a regulator in the marketplace."   *Def.'s Mot.* at 20 (quoting *Student Gov't Ass'n*, 868 F.2d at 477).   The Governor contends, "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of

29

the message or transform the government's role into that of a mere forum-provider."
*Id.* at 21 (quoting *Walker*, 135 S. Ct. at 2251). He reiterates that "the primary purpose
of [his] Facebook page is to express *his* viewpoints, policies, and concerns to his
supporters, not to give constituents a platform to express their views in a marketplace
of ideas or a channel to communicate their concerns to the Governor." *Id.* (emphasis
in original). The Governor concedes that under certain circumstances a court might
fairly conclude that a government official's website is a public forum, but he
maintains that the right circumstances are not present here. *Id.*

## 2. The Plaintiffs' Position

With respect to forum analysis, the Plaintiffs aver that "[i]t does not matter
which type of forum the Governor's Facebook page created because viewpoint
discrimination (as occurred here) is prohibited in all forums." *Pls.' Opp'n* at 21.
Citing *Packingham*, they state that the Supreme Court has been clear that certain
Internet platforms are forums for First Amendment purposes. *Id.* at 21 (citing
*Packingham*, 137 S. Ct. at 1735-36). The Plaintiffs assert that the Governor's
Facebook page is best understood as a public forum, but they maintain that the
viewpoint discrimination that the Governor engaged in is prohibited irrespective of
the type of forum. *Id.* at 21-22.

The Plaintiffs distinguish *Student Government Association* by pointing out
that there, the public university-defendant's paying for legal services made the
university "a player," rather than a "regulator," in the marketplace of ideas. *Id.* at
22 (citing *Student Gov't Ass'n*, 868 F.2d at 477). They posit that here, by contrast,

the Governor acted as a regulator when he deleted their speech and banned them from participating on his official Facebook page. *Id.* at 22.

The Plaintiffs argue that Facebook's status as a privately-owned entity does not matter for forum analysis. They cite *Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975), which involved a government-leased (not publicly-owned) theater "under [the] control" of public officials. *Id.* at 22 (quoting *Southeastern Promotions*, 420 U.S. at 555). They assert that the same conclusion applies here, where the Governor controls his page, though owned by a private corporation. *Id.*

The Plaintiffs reject the Governor's assertion that the availability of other fora for their speech negates their need to speak on his Facebook page. *Id.* at 23-24. They state "[t]o the contrary, the Court in *Southeastern Promotions* expressly rejected a similar argument, holding that the potential availability of 'some other, privately owned, theatre . . . is of no consequence.'" *Id.* at 24 (quoting *Southeastern Promotions*, 420 U.S. at 556).

### 3. Analysis

Based on the allegations in the Plaintiffs' Complaint, the Court declines to adopt the Governor's view that all of what appears on his Facebook page constitutes his speech. It follows that the Court does not agree with his argument that the page is government speech inappropriate for forum analysis. The Governor's deletion of posts and banning of participants are actions that speak to a government role as a regulator in a marketplace of ideas, not as a participant. *See Pleasant Grove City*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private

speech; it does not regulate government speech"); *Student Gov't Ass'n*, 868 F.2d at 477 (forum analysis "focuses on the government in its role as a regulator in the marketplace of ideas").

In any event, the Supreme Court's jurisprudence of government speech is rooted in a concern that "government would not work" if forum analysis applied to government speech. *Walker*, 135 S. Ct. at 2246; *see also Pleasant Grove City* 555 U.S. at 468 (citation and internal quotations omitted) ("If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed. To govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising the government's voice in the 'marketplace of ideas' would be out of the question."). The Court is not convinced that this concern is at play here. The Plaintiffs' posts to the Governor's Facebook page do not appear to hinder governance nor the Governor's ability to speak.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. For First Amendment purposes, there are traditionally three types of fora: "traditional public fora, designated public fora, and non-public fora." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004). These may include intangible channels of communication. *Student Gov't Ass'n*, 868 F.2d at 476. "[W]hether or not a given place is deemed a 'public forum' is ordinarily less significant than the nature of the speech restriction—despite the

Court's rhetoric." *Ridley*, 390 F.3d at 75-76 (quoting Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW § 12–24, at 992 (2d ed. 1988)).

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" and "public issues" through the "exposition" of one's political opinions. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citations and internal quotations omitted). The right to disseminate such "core political speech" on one's social media account is "an area highly protected by the First Amendment." In *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016), the First Circuit struck down a New Hampshire law that prohibited people from photographing their marked ballots and publicizing the photographs on social media. Characterizing such postings as "core political speech," the First Circuit wrote that "there is an increased use of social media and ballot selfies in particular in service of political speech by voters" and as such, laws restricting these postings on social media accounts would affect political speech, "which occupies the core of the protection afforded by the First Amendment." *Id.* at 75 (internal quotations omitted). In *Packingham*, the Supreme Court wrote that "[s]ocial media offers 'relatively unlimited, low-cost capacity for communication of all kinds.'" 137 S. Ct. at 1735 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)). It therefore provides "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 1737 (quoting *Reno*, 521 U.S. at 870). They can be used for "a wide array of protected First Amendment activity." *Id.* at 1735-36.

Social media platforms such as Facebook are "places" where people "can speak and listen," and are subject to the forum analysis. *Id.* at 1735.

The Governor's argument about Facebook being a private entity is not dispositive. In *Southeast Promotions*, the Supreme Court concluded that a privately owned theater under a long-term lease to a city was a public forum. 420 U.S. at 555. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. This is true even in non-public fora. *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("Access to a nonpublic forum, however, can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'")). Hence, whether the Facebook page is a public forum, a designated public forum, or a non-public forum, viewpoint discrimination is not permissible. *See id.* at 806; *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

The Governor does not dispute the Plaintiffs' claims that his deletion of their posts and banning of them from his page constituted viewpoint discrimination. Given this and the Court's conclusion that forum analysis does apply, the Court finds that the Plaintiffs plausibly stated a claim for violation of their free speech rights under the First Amendment.

### D.    *Morgan v. Bevin*

#### 1.    **The Parties' Positions**

The Governor's supplementary memorandum calls the Court's attention to a case he argues is analogous and supports his motion to dismiss: *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018). *Def.'s Suppl. Mem*. at 1-3.

The Plaintiffs argue that the procedural posture of *Morgan*—a motion for preliminary injunction—requires a different result than the pending motion to dismiss. *Pls.' Suppl. Resp.* at 1. They also distinguish *Morgan* on its facts. *Id.* at 1-4. The Plaintiffs state that the *Morgan* Court misapprehended the effect of banning a Facebook user from a page when it characterized that step as refusing "to listen" to the banned person. *Id.* at 2. The Plaintiffs aver that banning a user "does not merely allow the page owner to refuse 'to listen' to constituents' views; it also prevents blocked constituents from speaking on that platform altogether." *Id.* at 2 (citing Compl. ¶ 26).

The Plaintiffs also dispute the *Morgan* Court's finding that disallowing banning of users would flood the Kentucky Governor's pages "with internet spam" sufficient to "effectively, or actually" close the account. *Id.* at 2 (citing *Def.'s Suppl. Mem.* at 2-3 (quoting *Morgan*, 298 F. Supp. 3d at 1012)). They state that Governor LePage's Facebook page already garners "from tens to thousands of comments, likes, and shares," without flooding his Facebook page with spam. *Id.* at 2 (citing *Compl.* ¶ 6). They also state that Facebook's automatic display focuses attention on posts (rather than comments) by showing only several comments at a time and at a smaller

size than posts. *Id.* (citing Compl. ¶ 41). They assert *Davison* is more persuasive than *Morgan*. *Id.* at 4.

## 2. Analysis

In *Morgan*, the Eastern District of Kentucky denied a request for a preliminary injunction brought by two individuals who argued that the Governor of Kentucky violated their First Amendment rights by banning them from his official Facebook page as well as from his official page on Twitter, another social media platform. 298 F. Supp. 3d at 1014. The *Morgan* Court found that the plaintiffs did not demonstrate a strong likelihood of success on the merits because it determined the accounts to be government speech not appropriate for forum analysis. *Id.* at 1010-11, 1013. The *Morgan* Court wrote that, by banning the plaintiffs, the governor was essentially ignoring them, and that the plaintiffs had no cognizable right to be heard via his official social media accounts. *Id.* at 1011-12. The district court deemed the accounts "privately owned channels of communication and are not converted to public property by the use of a public official." *Id.* at 1011. The *Morgan* Court analogized to *Pleasant Grove City* and *Walker*: "Governor Bevin is permitted to cull his desired message through his Facebook and Twitter page, much like Pleasant Grove and Texas were allowed to engage in viewpoint discrimination when they did not allow certain monuments and did not allow certain specialty license plates." *Id.* at 1012-13 (citing *Walker* 135 S. Ct. 2239; *Pleasant Grove City*, 555 U.S. 460)).

For purposes of the motion to dismiss, the facts in *Morgan* are distinguishable, but more importantly, the Court declines—at this point—to follow key pillars of the

*Morgan* Court's reasoning. Based on the allegations in the Plaintiffs' Complaint, the Court sees the speech as the Plaintiffs' posts that the Governor deleted, as well as the future speech that they wish to engage in, within the forum of the "Paul LePage, Maine's Governor" Facebook page. Based on the allegations in the Complaint, the Court is unconvinced that the Governor adopts as his own speech each undeleted post made by someone else on the page. The Court also disagrees with the related notions that allowing a post to remain on a social media page amounts to "listening" or that the Plaintiffs are asserting "a right to be heard." The Court understands the Plaintiffs to be asserting a right to speak; whether their speech is heard and/or whether the Governor is listening are separate questions.

### E. Petition Clause Claim

#### 1. The Governor's Position

The Governor argues that the Petition Clause claim must be dismissed because his operation of the Facebook page does not constitute action under color of state law, thus rendering the Plaintiffs' § 1983 claim deficient. *Def.'s Mot.* at 22. He argues in the alternative that, even if the Plaintiffs alleged that he is acting under color of state law when he manages "Paul LePage, Maine's Governor," he argues that his First Amendment rights are not trumped by the Plaintiffs' right to petition the government. *Id.*

The Governor cites caselaw supporting his contention that the Plaintiffs' Petition Clause rights do not include the right to present their petitions by whatever method they choose. *Id.* at 22-23. He points out that "the operation of the page leaves

open official channels to petition the Governor, and specifically directs visitors to those channels instead of the page." *Id*. at 2; *see id*. at 23.

### 2.    The Plaintiffs' Position

The Plaintiffs acknowledge that their Petition Clause claim is closely related to their Free Speech Clause claim, and they urge the Court to reject the Governor's arguments for dismissal. *Pls.' Opp'n* at 24.   However, the Plaintiffs distinguish the claims, quoting *Borough of Duryea, Pennsylvania v. Guarnieri*, 564 U.S. 379 (2011): "Both speech and petition are integral to the democratic process, although not necessarily in the same way.  The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas . . . ." *Pls.' Opp'n* at 24 (quoting *Guarnieri*, 564 U.S. at 388).  The Plaintiffs maintain that the existence of an alternative method to petition the government does not matter. *Id.* at 25.  They contend that once the Governor opened a public channel for petition, he may not exclude petitioners based on their viewpoints. *Id.*

### 3.    Analysis

The First Amendment guarantees every citizen's right "to petition the Government for a redress of grievances." U.S. CONST. amend. I.  "The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  The right "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives . . . [and is] generally concerned

with expression directed to the government seeking redress of a grievance." *Guarnieri*, 564 U.S. at 388. "Petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole." *Id.* at 395. "Interpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right. A petition conveys the special concerns of its author to the government . . . ." *Id.* at 388-89.

The Plaintiffs allege that the content of their posts to "Paul LePage, Maine's Governor" pertained to the Governor's interactions with the news media and his deletion of the posts of other Facebook users from his page. The Governor does not contend that these posts fail to touch on the objectives and aspirations that underlie the right to petition. Instead, he points out that the Petition Clause does not guarantee the Plaintiffs the right to petition through any channel of their choosing, and he claims that alternative petition channels exist for the Plaintiffs.

The Governor is correct with respect to the scope of the right to petition. It is not absolute. It does not include the right to baseless litigation nor to "petitions to the President that contain intentional and reckless falsehoods . . . ." *McDonald*, 472 U.S. at 484. The Governor cites *Curnin v. Town of Egremont*, 510 F.3d 24 (1st Cir. 2007), where the First Circuit determined that a town's policy of not permitting non-voters who owned property and paid taxes in the town to speak at town meetings did not offend the First Amendment and that the town meeting moderator did not engage in viewpoint discrimination. *Id.* at 25-26. However, *Curnin* is inapposite because it does not involve interpretation of the Petition Clause and, in any event, it does not

support his suggestion that the existence of alternative channels for petition is determinative.

The Governor cites no authority for the view that alternative channels for petition render a claim for violation of the Petition Clause nonviable, and the Court found none. The Governor does not analogize the Plaintiffs' communications via "Paul LePage, Maine's Governor" to frivolous litigation or to petitions to the President that contain intentional or reckless falsehoods. Thus, based on the allegations in the Complaint, the Court is unpersuaded that Count II fails to state a claim upon which relief can be granted.

### F.    Maine Constitutional Claims

The Governor argues that the Plaintiffs' claims arising out of the Maine Constitution are parallel to and duplicative of their federal claims and they fail for the same reasons the federal claims fail. *Def.'s Mot*. at 2, 23-24. He quotes the Maine Supreme Judicial Court: "[w]ith respect to the protection of freedom of speech, the Maine Constitution is no less restrictive than the Federal Constitution." *Id.* at 23 (quoting *City of Bangor v. Diva's, Inc.*, 2003 ME 51, ¶ 11, 830 A.2d 898) (citation and internal quotations omitted)). With respect to Count IV, the Governor characterizes the Law Court jurisprudence as sparse. *Id.* at 24.

Because the Court has determined that dismissal of the Plaintiffs' federal claims is unwarranted, and because the Governor's argument for dismissal of the Maine constitutional claims is no different than his arguments for dismissal of the

federal claims, the Court denies the motion to dismiss with respect to Counts III and IV.

## IV.    CONCLUSION

The Court DENIES the Defendant's Motion to Dismiss (ECF No. 9).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of August, 2018